THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ADMINISTRADORA DE )
PROYECTOS NEOMED, A )
GUSTAVO PARENTE, )
SOCIEDAD ANONIMA )
                 )
      Plaintiff, )
                 )     Case No. 09 C 580
                 )
                 )     Magistrate Judge
                 )     Arlander Keys
v. )
                 )
                 )
CHICAGO FIRE SOCCER, LLC, )
A DELAWARE LIMITED )
LIABILITY COMPANY )
                 )
      Defendant. )

## **MEMORANDUM OPINION AND ORDER**

Plaintiff and Defendant entered into a settlement agreement whereby, *inter alia*, each agreed to release its claims against the other. Plaintiff, however, failed to discharge its claims within the time prescribed by the agreement. In fact, it no longer wishes to surrender its claims. Before the Court is Plaintiff's Motion to Declare August 25, 2009 Settlement Agreement Null and Void and Defendant and Counter-Plaintiff Chicago Fire's Motion to Enforce Settlement Agreement. For the reasons set forth below, the Court denies Plaintiff's motion and grants Defendant's cross-motion.

## Factual Background

Plaintiff and Defendant entered into a contractual arrangement with one another. Specifically, Chicago Fire Soccer, LLC (Chicago Fire) agreed to field a professional soccer team to compete in a match against Club San Luis (another professional team) in Mexicali, Mexico; this match was to be promoted by Administradora de Proyectos Neomed, a Gustavo Parente, Sociedad Anonima (APN). On the scheduled day of the soccer match, however, the Chicago Fire arrived at the stadium, found the field conditions to be "unacceptable," and refused to play. Defendant did not play at all while in Mexico; instead, it immediately returned to the United States. APN's subsequent attempts to reschedule the match for a later date proved futile. Consequently, it filed a two-count Verified Complaint on January 29, 2009.

During the pendency of the litigation, and at the encouragement of a third party, Showlatin, S.A. de C.V. (Showlatin), the parties entered into settlement negotiations. To this end, a meeting was held in Mexico on August 25, 2009. Present at the commencement of said meeting were Rodolfo Ayala (Ayala), Showlatin's principal; Gustavo Parente (Parente), President of APN; Rudy Valner (Valner),[1] counsel for Chicago

---

[1] The Court notes that Mr. Valner is not Chicago Fire's attorney of record. However, in an affidavit dated September 18, 2009, he attests that he has, indeed, been retained as counsel by

2

Fire; and Javier Leon (Leon) and Emigdio Gamboa (Gamboa), additional Chicago Fire representatives. Richard R. Gordon (Gordon), counsel of record for APN, was not present.

After lengthy negotiations, the parties reached a satisfactory agreement; they then took a break and had lunch together at a local restaurant. Upon their return to the office, Attorney Fernando Quiroga Leal (Leal) and Rafael Juan Munoz Cantu (Cantu), his legal clerk, joined the meeting. Mr. Parente, Attorney Leal, and Mr. Cantu subsequently left the meeting room and went to another area. They returned with the Settlement and Termination Agreement (Agreement). It provided, *inter alia*, that the party that failed, within fifteen days, to release its claims against the opposing party would be required to pay the complying party a sum of $200,000. After further negotiation, the Agreement was signed by Mr. Parente on behalf of APN and Mr. Javier Leon Bermejillo[2] for Chicago Fire. The parties enjoyed a "celebratory dinner" at a local restaurant following the Agreement's execution.

The merriment was brief, however, as Plaintiff failed to terminate its claims within the fifteen day period. Actually, it has yet to release its claims. And does not intend to do so

---

Chicago Fire. (Valner Aff. Ex. B at 1.)

[2] The Court presumes that Javier Leon and Javier Leon Bermejillo are one and the same.

voluntarily. Instead, it filed a motion to have the Court declare the Agreement void. Conversely, Defendant seeks its enforcement.

**Discussion**

The Court must resolve two issues, both of which go to the enforceability of the Agreement: 1) whether an attorney's alleged violation of Illinois Rule of Professional Conduct 4.2 renders the Agreement null and void, and 2) whether the contract provision that allows for the payment of a monetary sum upon breach of the contract, is in fact an enforceable liquidated damages provision or a void penalty clause.[3]

"A motion to enforce a settlement agreement is essentially the same as a motion to enforce a contract." *Allstate Fin. Corp. v. Util. Trailer of Illinois, Inc.*, 936 F. Supp. 525, 528 (N.D. Ill. 1996)(citing *Adams v. Johns-Manville Corp.*, 876 F.2d 702, 709 (9th Cir. 1989); *Herron v. City of Chicago*, 618 F. Supp. 1405, 1409 (N.D. Ill. 1985)). If a federal court has jurisdiction to enforce a settlement agreement,[4] it will look to the applicable state contract law for guidance. *Id.* (citing *Herron*, 618 F. Supp. at 1409). In Illinois, the parties to a

---

[3] In its motion, Plaintiff also states that the Agreement is null and void for lack of consideration. However, APN failed to raise this issue in its supporting memorandum. Consequently, the Court finds no reason to address the issue.

[4] In the case *sub judice*, the Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).

4

settlement agreement will be bound, like in any contract, where there was "an offer, an acceptance, and a meeting of minds on terms." *Lampe v. O'Toole*, 685 N.E.2d 423, 424-25 (Ill. App. Ct. 1997)(citing *McAllister v. Hayes*, 519 N.E.2d 71, 72 (Ill. App. Ct. 1988); *Sheffield Poly-Glaz, Inc. v. Humboldt Glass Co.*, 356 N.E.2d 837, 840 (Ill. App. Ct. 1976)).

## I.  Illinois Rule of Professional Conduct 4.2

Plaintiff argues that Attorney Valner negotiated with Mr. Parente during the August meeting despite the absence of APN's attorney of record, in direct violation of Rule 4.2 of the Illinois Rules of Professional Conduct. Consequently, it maintains that the resulting settlement agreement is null and void. As a result, it should not be enforced.

Illinois Rule of Professional Conduct 4.2 provides that

> During the course of representing a client a lawyer shall not communicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by another lawyer in that matter unless the first lawyer has obtained the prior consent of the lawyer representing such other party or as may otherwise be authorized by law.

Ill. Sup. Ct. R. Prof'l Conduct 4.2. The Rule serves two distinct, albeit related, purposes. "It preserves the integrity of the lawyer-client relationship by prohibiting contact, absent consent or legal authorization, with the represented party." *In re Air Crash Disaster Near Roselawn, Indiana*, 909 F. Supp. 1116, 1121 (N.D. Ill. 1995)(citing *Pub. Serv. Elec. & Gas Co. v.*

5

*Associated Elec. & Gas Ins. Servs., Ltd.*, 745 F. Supp. 1037, 1039 (D.N.J. 1990)). Additionally, it "recognizes that without such a Rule 'the professionally trained lawyer may, in many cases, be able to win, or in the extreme case coerce, damaging concessions from the unshielded layman.'" *Id.* (quoting *Pub. Serv. Elec.*, 745 F. Supp. at 1039). Certainly "[t]here is nothing more central to what it means to be a client in the American system of justice than to know that, having hired a lawyer, the client need not worry about being taken advantage of by lawyers, with special skills and training, who represent others." *Parker v. Pepsi-Cola Gen. Bottlers, Inc.*, 249 F. Supp. 2d 1007, 1008 (N.D. Ill. 2003)(quoting ABA Comm. On Ethics and Prof'l Responsibility, Formal Op. 95-396 (1995)). Consequently, the represented party's "consent to the contact does not mitigate or remove the ethical taint that results from such a communication." *Blanchard v. Edgemark Fin. Corp.*, 175 F.R.D. 293, 301-02 (N.D. Ill. 1997)(citing *Faison v. Thornton*, 863 F. Supp. 1204, 1213 (D. Nev. 1993); ABA/BNA LAWYER'S MANUAL ON PROFESSIONAL CONDUCT at § 71:302 (June 22, 1998)).

APN maintains that Attorney Valner was aware that it was represented by counsel in Chicago, namely, Attorney Gordon. Though Defendant does not dispute this, it steadfastly maintains that it believed that Attorney Leal represented Mr. Parente during the negotiations held in Mexico. To bolster its

6

contention, Defendant submitted the affidavit of Mr. Ayala, who stated that he had introduced Mr. Parente to Attorney Leal in response to Mr. Parente's stated desire to find an attorney in Mexico that "could save him some money." Additionally, Mr. Leon attested to Mr. Parente's statement that he did not want his Chicago counsel present at the meeting "due to the cost of their participation." Mr. Parente's subsequent actions were not inconsistent with these statements.

The Court declines to decide whether Attorney Valner indeed violated Rule 4.2, as this determination is not central to its analysis. Indeed, the violation of the Rule is not dispositive. Rather, the controlling issue is whether the alleged misconduct "result[ed] in prejudice or adversely impact[ed] the rights of" Plaintiff. *Beale v. Edgemark*, 697 N.E.2d 820, 827-28 (Ill. App. Ct. 1998)(citations omitted); *See also Parker*, 249 F. Supp. 2d at 1011 (N.D. Ill. 2003)(holding that "it is appropriate to consider . . . the nature and extent of *prejudice suffered or likely to be suffered* by the parties in the future as a result of the violation" when deciding appropriate sanctions for ethical violations)(emphasis added). In fact, a search of Illinois case law failed to disclose a single case where the relief sought by Plaintiff was granted based solely on a Rule 4.2 violation, alleged or proven. Actually, it is quite the contrary -- courts generally enforce the settlement agreements in such instances.

7

See *Blanchard*, 175 F.R.D. at 303, 305 (though finding a violation of Rule 4.2, the court held that "the settlement agreement is a *fait accompli* in that it has been fully executed and may not now be undone."); *Beale*, 697 N.E.2d at 829-30 (the court declined to disturb the settlement agreement, finding that its only "infirmity" was "that the attorneys who obtained it may have done so by violating Rule 4.2 of the Illinois Rules of Professional Conduct.").

Plaintiff relies on *Heiden v. Ottinger*, 616 N.E.2d 1005 (Ill. App. Ct. 1993), for support.[5] Its reliance, however, is misplaced. In *Heiden*, the parties were involved in a paternity suit. *Id.* at 1007. Before discharging her attorney and without any notice to him, the mother agreed to settle the matter with the father. *Id.* at 1008. The agreement, prepared by the father's attorney, provided that each party would pay its own attorney's fees. *Id.* The day following execution of the agreement, the mother discharged her attorney. *Id.* The settlement agreement was later approved by the court, all without the discharged attorney's knowledge. *Id.* Subsequently, the court, notwithstanding the agreement, allowed the discharged

---

[5] APN also maintains that the court's holding in *Richards v. Holsum Bakery, Inc.*, No. CV09-00418-PHX-MHM, 2009 U.S. Dist. LEXIS 109337 (D. Ariz Nov. 5, 2009), is "instructive." Aside from not being binding on this Court, the facts of *Richards* are wholly inapposite to those of the case at bar, and do not warrant further discussion.

8

attorney to pursue the collection of his fees from the father. *Id.* However, the court did not base its decision solely on the improper conduct of the father's attorney. Indeed, evidence of prejudice was alleged and proven. Specifically, it was shown that the mother was unable to pay her attorney and that the mother and father had colluded to prevent the attorney from collecting his fees from the father. *Id.* 1008, 1011. No such prejudice, indeed, no prejudice at all, was established in the instant case.[6]

As an initial matter, a client has an "absolute right" to settle its case without the consent of its attorney. *Heiden*, 616 N.E.2d at 1009. In the case at bar, the facts establish that Mr. Parente wanted to settle the case without Attorney Gordon's involvement or consent, and he did just that. To be sure, he travelled to the meeting in Mexico without his attorney. Without even his attorney's knowledge. By his own admission, he spent "four to five hours" at the meeting. And while APN makes much ado about Attorney Valner's failure to leave the meeting, halt it, or contact Attorney Gordon upon realizing that Mr. Parente was unrepresented, the Court finds more telling *Mr. Parente's* failure to do so. But evidence of Mr. Parente's intent to settle his claims – which he has the right to do – without Attorney

---

[6] The Court also notes that the *Heiden* court voided the contract provision for the benefit of an individual who was *not a party to the contract*. See *Heiden*, 616 N.E.2d.

9

Gordon's consent, does not stop there. Affidavits of not one, not two, but three individuals bolster this assertion. Specifically, Mr. Leon, Attorney Valner, and Mr. Ayala all averred that Mr. Parente did not want his Chicago counsel involved as they "had already cost him plenty of money and he did not want to spend money on them anymore." (Valner Aff. Ex. B at 1). Plaintiff does not deny this. Indeed, he cannot, as the circumstances (the absence of Chicago counsel and Attorney Gordon's seeming unawareness of the meeting) support the statements provided in the affidavits.[7]

Recognizing the deficiencies in its claims, Mr. Parente next alleges that he was the victim of undue influence, arguing that "Attorney Valner coerced, threatened and harassed [him] into signing an unconscionable agreement." Coercion, is, indeed, a ground for invalidating the terms of a settlement agreement. *Flood v. Ty, Inc.*, No. 02 C 9497, 2005 U.S. Dist. LEXIS 7974, at *31-2 (N.D. Ill. Apr. 5, 2005)(citing *Porter v. Chicago Bd. of Educ.*, 981 F. Supp. 1129, 1131-32 (N.D. Ill. 1997)). It has been defined as "the imposition, oppression, undue influence or the taking advantage of the stress of another whereby one is deprived

---

[7] APN further argues that, prior to the meeting, Mr. Parente believed that neither party would be represented by counsel. This argument does not merit much discussion, as the aforementioned statements were made by Mr. Parente even after realizing that Chicago Fire was represented by counsel at the meeting.

10

of the exercise of his free will." *Id.* (quoting *Porter*, 981 F. Supp. at 1132). The person asserting coercion bears the burden of proving it by clear and convincing evidence. *Id.* at *32 (citing *Porter*, 981 F. Supp. at 1132; *In re Gibson-Terry & Terry*, 758 N.E.2d 459, 468 (Ill. App. Ct. 2001). Mr. Parente has failed to make an adequate showing.

APN maintains that "Attorney Valner utilized his status as a lawyer well-versed in the American judicial system to add credibility to his claimed knowledge of the risks of litigation and as a tool to intimidate and bully Mr. Parente, a Mexican citizen." Specifically, Mr. Parente argues that he signed the Agreement, in part, because Attorney Valner told him that "lawsuits in the United States are very long and very expensive." He argues that this stressed and instilled fear in him. But presumably his own attorney informed him of this at the outset of the litigation. Litigation can be protracted. It can be expensive. And there are risks. Certainly, these statements are not sufficient bases upon which to vacate an agreement that Mr. Parente intentionally and wilfully entered into. Nor are Mr. Parente's allegations that he felt bullied and intimidated, considering that he remained at the meeting for at least 4 hours and even joined the other participants for both lunch and dinner. This is hardly the behavior of an individual that felt "threatened," "pressured," or "harassed." Rather, it is

completely consistent with the assertions of the other individuals present, that there were ongoing negotiations. Negotiations in which Mr. Parente actively participated. Consequently, Mr. Parente has failed to show by any evidence, clear and convincing, or otherwise, that he was the victim of coercion.

Neither is the Court persuaded by Mr. Parente's contention that he "did not understand the legal ramifications of his actions." Directly above his signature, in boldface, was the phrase, "CONVENIO DE FINIQUITO Y TERMINACION." Mr. Parente is a sophisticated businessman. Indeed, the litigation arises from a soccer match between professional teams, one international, that he agreed to promote. It is also significant that, by the accounts of the other participants, the Agreement was drafted by Attorney Leal, during private consultation with Mr. Parente, himself. The Court thus finds disingenuous Mr. Parente's claim that he did not understand that by signing the Agreement, APN's claims were to be terminated.

Consequently, the Court declines to vacate the Agreement based upon the alleged violation of Rule 4.2. Further, the Court presumes that the Illinois Attorney Registration and Disciplinary Committee (ARDC) will commence disciplinary proceedings against Attorney Valner should it determine that the misconduct in fact, occurred.

## II. $200,000 Provision

Plaintiff maintains that the provision requiring the payment of $200,000 by the breaching party is an unenforceable penalty clause. Therefore, it asks that the Court not enforce the Agreement.

"It is a rule of the common law of contracts, in Illinois as elsewhere, that unless the parties' ex ante estimate of damages is reasonable, their liquidated damages provision is unenforceable as a penalty intended to 'force' performance." *XCO Int'l, Inc. v. Pac. Scientific Co.*, 369 F.3d 998, 1001 (7th Cir. 2004). The party resisting enforcement bears the burden of showing that "the agreed-upon damages are clearly disproportionate to a reasonable estimate of the actual damages likely to be caused by a breach." *Id.* at 1003 (citations omitted).

The provision at issue provides that,

> The parties are bonded to formally refraining from CLAIMS, in addition to any further proceedings, claims and/or demands promoted against the other party within a term of fifteen (15) days calculated as from signing of this instrument. In view of a breach of any of the previously established conditions, the non-complying party will pay the other party a conventional penalty of $200,000 (two hundred thousand and 00/100 United States American Dollars currently in force). Each party will be held responsible for fees and any other further incurred expenses arising from said claims.

Defendant argues that $200,000 is a reasonable estimate of the cost of its attorneys' fees in continuing the

13

litigation, in the event that the claims were not released by the deadline. Plaintiff fails to address this argument. Instead it argues that the description of the $200,000 as a "conventional penalty" alone, indicates that it is a penalty clause, and also makes two misplaced arguments regarding the applicability to the underlying contract and the availability of attorney's fees to the prevailing party.

The Court can dispose of the first argument regarding the clause's description, in short order. Plaintiff failed to cite a single case wherein the court categorized a provision based solely on its title. Had such case law been presented to the Court, it would likely have been distinguishable, as the original contract at issue here was in Spanish and it is entirely possible that something was lost (or added) in translation.

Nevertheless, the Court notes that in the case at bar, the same amount would be owing despite the gravity of the breach. For example, if only a telephone call was required to secure Plaintiff's performance, Plaintiff would owe $200,000. If motions necessitated the involvement of multiple attorneys over an extended period, APN would owe $200,000. Indeed, "[t]he element common to most liquidated damages clauses that get struck down as penalty clauses is that they specify the same damages regardless of the severity of the breach." *XCO*,

14

389 F.3d at 1004 (citations omitted). However, in light of the "emerging presumption against interpreting liquidated damages clauses as penalty clauses," *XCO*, 369 F.3d at 1003, and Plaintiff's failure to meet its burden, choosing instead to rest on its bald assertions of unreasonableness, the Court finds that, while seemingly excessive, Plaintiff has not shown that the provision at issue is a penalty clause.[8] Further, even if the Court had determined that the provision is a penalty clause, the relief sought by Plaintiff, the vacating of the Agreement, is not available. Indeed, "the proper judicial remedy would be to reform the clause." *Id.* at 1004-05. Indeed, "[t]here would be no reason to invalidate the clause in its entirety." *Id.* (citations omitted). As such, the Agreement is not deemed null and void on this basis.

---

[8] The Court further notes that Plaintiff and Attorney Leal advocated for inclusion of the provision at issue. Certainly, the law does not favor allowing Plaintiff to use as justification for repudiation *ex post*, a clause that he, himself, proposed.

## Conclusion

For the reasons set forth above, Plaintiff's Motion to Declare August 25, 2009 Settlement Agreement Null and Void is denied and Defendant and Counter-Plaintiff Chicago Fire's Motion to Enforce Settlement Agreement is granted. Accordingly, this matter having been settled between the parties, IT IS HEREBY ORDERED that the Verified Complaint herein be, and the same hereby is, DISMISSED.

Date: January 25, 2010        E N T E R E D:

*[signature]*

MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES ~~DISTRICT~~ COURT